IN THE UNITED STATES DISTRICT COURTS
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

MISTIE WEST o/b/o                                                                          PLAINTIFF
J.W.

      v.                                       CIVIL NO.13-2173

CAROLYN W. COLVIN,[1] Commissioner
Social Security Administration                                                             DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

      Plaintiff brings this action on behalf of J.W., a minor child, seeking judicial review pursuant to 42 U.S.C. § 405(g), of the decision of the Commissioner of the Social Security Administration (Commissioner), denying A.B.'s application for child's supplemental security income (SSI) benefits under Title XVI of the Social Security Act.

**I. Background**

      Plaintiff filed an application for SSI on J.W.'s behalf on May 26, 2011, alleging that J.W. was disabled due to traumatic brain injury and left subdural hematoma hemiplegia. (Tr.143.) An administrative hearing was held on February 15, 2012. J.W. was present and represented by counsel. (Tr. 28.). The ALJ also heard testimony from Terry West (J.W.'s father) and Dee Ladawn West a/k/a/ Mistie West (J.W.'s mother). (Tr. 34,54, 142.) At the time, J.W. was a little over 2.5 years old. (Tr. 38.)

      The Administrative Law Judge ("ALJ"), in a written decision dated June 14, 2012, found that although severe, J.W.'s history of a left parietal skull fracture with a left subdural hematoma and compression of the left side of the basilar cisterns did not meet, medically equal, or functionally equal one of the impairments listed in 20 C. F. R. Part 404, Subpart P, Appendix 1. (Tr. 21.) He concluded that J.W. had less

---

[1] Carolyn W. Colvin became the Social Security Commissioner on February 14, 2013. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin has been substituted for Commissioner Michael J. Astrue as the defendant in this suit.

than marked limitation in the domain of "health and physical well-being," and no limitations in the other domains. (Tr. 29.)

On May 14, 2013, the Appeals Council declined to review this decision. (Tr. 1.) Subsequently, Plaintiff filed this action. (ECF No. 1.) Both parties have filed appeal briefs, and the matter is now ready for decision.

## II. Standard of Review

The Court's review is limited to whether the decision of the Commissioner to deny benefits to the plaintiff is supported by substantial evidence on the record as a whole. *See Ostronski v. Chater*, 94 F.3d 413, 416 (8th Cir. 1996). Substantial evidence means more than a mere scintilla of evidence, it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Pearles*, 402 U.S. 389, 401 (1971). The court must consider both evidence that supports and evidence that detracts from the Commissioner's decision, but the denial of benefits shall not be overturned even if there is enough evidence in the record to support a contrary decision. *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996).

In determining the plaintiff's claim, the ALJ followed the sequential evaluation process, set forth in 20 C.F.R. § 416.924. Under this most recent standard, a child must prove that she has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(c)(I); 20 C.F.R. § 416.906.

When passing the law, as it relates to children seeking SSI disability benefits, Congress decided that the sequential analysis should be limited to the first three steps. This is made clear in the House conference report on the law, prior to enactment. Concerning childhood SSI disability benefits, the report states:

> The conferees intend that only needy children with severe disabilities be eligible for SSI, and the Listing of Impairments and other current disability determination regulations as modified by these provisions properly reflect the severity of disability contemplated by the new statutory definition.... The conferees are also aware that SSA uses the term "severe" to often mean "other than minor" in an initial screening procedure for disability determination and in other places. The conferees, however, use the term "severe " in its common sense meaning.

142 Cong. Rec. H8829-92, 8913 (1996 WL 428614), H.R. Conf. Rep. No. 104- 725 (July 30, 1996).

Consequently, under this evaluation process, the analysis ends at step three with the determination of whether the child's impairments meet or equal any of the listed impairments. More specifically, a determination that a child is disabled requires the following three-step analysis. *See* 20 C.F.R. § 416.924(a). First, the ALJ must consider whether the child is engaged in substantial gainful activity. *See* 20 C.F.R. § 416.924(b). If the child is so engaged, he or she will not be awarded SSI benefits. *See id.* Second, the ALJ must consider whether the child has a severe impairment. *See* 20 C.F.R. § 416.924(c). A severe impairment is an impairment that is more than a slight abnormality. *See id.* Third, if the impairment is severe, the ALJ must consider whether the impairment meets or is medically or functionally equal to a disability listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). *See* 20 C.F.R. § 416.924(c). Only if the impairment is severe and meets or is medically or functionally equal to a disability in the Listings, will it constitute a disability within the meaning of the Act. *See* 20 C.F.R. § 416.924(d). Under the third step, a child's impairment is medically equal to a listed impairment if it is at least equal in severity and duration to the medical criteria of the listed impairment. 20 C.F.R. § 416.926(a). To determine whether an impairment is functionally equal to a disability included in the Listings, the ALJ must assess the child's developmental capacity in six specified domains. *See* 20 C.F.R. § 416.926a(b)(1). The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and, (6) health and physical well-being. *See* 20 C.F.R. § 416.926a(b)(1); *see also Moore ex rel. Moore v. Barnhart*, 413 F.3d 718, 722 n. 4 (8th Cir. 2005).

If the child claiming SSI benefits has marked limitations in two categories or an extreme limitation in one category, the child's impairment is functionally equal to an impairment in the Listings. *See* 20 C.F.R. § 416.926a(d). A marked limitation is defined as an impairment that is "more than moderate" and "less than extreme." A marked limitation is one which seriously interferes with a child's ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(2). An extreme limitation is defined as "more

3

than marked," and exists when a child's impairment(s) interferes very seriously with his or her ability to independently initiate, sustain or complete activities. Day-to-day functioning may be very seriously limited when an impairment(s) limits only one activity or when the interactive and cumulative effects of the impairment(s) limit several activities. *See* 20 C.F.R. § 416.926a(e)(3).

## III. Discussion

Plaintiff raises two issues on appeal: 1) the ALJ erred in finding that the Plaintiff did not have at least marked impairment in the domains of "attending and completing tasks" and "interacting and relating to others"; and 2) the ALJ failed to fully develop the record. (Pl.'s Br. 10, 13.) Neither of these arguments is supported by the record.

In this case, the record indicates that J.W. suffered a traumatic head injury at her daycare on May 13, 2011. (Tr. 270.) She presented at St. Edward Mercy Medical Center emergency room "unresponsive and with decerebrate posturing." (Tr. 270.) A CT scan revealed a "large left frontal subdural/extraaxial hyperdense hematoma at least 1.5 thickness over the left frontal fronteparietal vertex with midline sift from left to right by 8 or 9 mm. Significant impression on the left lateral ventricle."(Tr. 278.) J.W. was in unstable condition and was transferred by Air Evac to Arkansas Children's Hospital. (Tr. 274, 301.)

She underwent an emergency craniotomy to drain the subdural hematoma. (Tr. 301.) After her surgery, she had two seizures on May 17. She was loaded with Ativan and Keppra. (Tr. 232.) An EEG and MRI were ordered. These showed residual subdural hemorrhage and an extensive area of restricted diffusion with cortical swelling. (Tr. 232.) She was transferred to the rehab service on May 18, where she continued to have seizures. Dilantin was added to the Keppra. (Tr. 232.) She experienced an allergic reaction to the Dilantin. The Keppra resulted in irritability, which was countered with the use of Vitamin B6. Neurosurgery ordered a noncontrast CT scan right before discharge for comparison to future images. There were no abnormalities. (Tr. 233.)

AO72A
(Rev. 8/82)

J.W. was discharged from Arkansas Children's Hospital on May 31, 2011. Final diagnoses at the time of discharge were traumatic brain injury, left subdural hematoma with resultant right hemiplegia, left retinal hemorrhage, posttraumatic seizures. (Tr. 231.) Discharge medications were Keppra twice a day, Vitamin B6, and Diazepam as needed to control seizures longer than 5 minutes. (Tr. 235.) Her Speech-Language Pathology Discharge summary stated that her expressive and receptive language scores were within normal limits, as were other sections of her evaluation. They did note that she did not consistently follow commands and inhibitory words. (Tr. 468.) However, the report stated that J.W.'s mother indicated that "she believes Joy has achieved her baseline level of function in regards to her speech." (Tr. 468.) Followup appointments were scheduled at 1 week for J.W.'s pediatrician Dr. James Cheshier, 1-2 months for a neurology followup with Dr. Amy Luat, 2-3 months with Dr. Stefans in Rehabilitation, and 3 months with Neurosurgery. (Tr. 235.)

Plaintiff filed for SSI on May 26, 2011, prior to J.W.'s discharge. (Tr. 143.)

J.W.'s pediatrician, Dr. James Cheshier, saw J.W. for followup on June 3, 2011. He stated: "Clinically, she looks amazingly well. She has a little mild right-sided weakness, but no other real problems. She is getting plugged in to all of her therapies. Follow up as needed." (Tr. 1189.)

J.W. was seen for a followup at the Arkansas Children's Hospital Neurosurgery Clinic on July 7, 2011. (Tr. 478.) The clinic history for this exam states in part: "Per her mom and dad, she is doing great, and they state that she is 'smarter than she was before surgery.' They have no concerns at this time and are very happy with how she is doing." (Tr. 478.) No seizures were reported. The CT scan showed "extra-axial fluid at the subdural evacuation site with some calcification noted." It was emphasized to J.W.'s parents that they needed to keep the followup appointment with neurology because they would be the ones to determine when she could be weaned off the seizure medication. (Tr. 478.)

J.W. was seen for a follow-up at the Arkansas Children's Hospital Neurology Clinic by Dr. Luat on August 10, 2011. (Tr. 1143.) Regarding her development, the record noted that "according to both parents

5

she is taking several words. She can combine 2 to 3 words. She plays with other kids. She is able to use both hands. She is no longer on any form of therapy." (Tr. 1143.) She was negative for seizures. (Tr. 1144.) Current exam was nonfocal. (Tr. 1145.) Her plan indicated that she was to continue Keppra. The notation indicated that J.W.'s mother asked about weaning off the Keppra, but that, due to the initial difficulty in controlling her seizures, she wanted to keep J.W. on the Keppra for two years. She would then do an EEG and if it turned out to be normal, and J.W. did not have any issues with seizures, then she could be weaned off the Keppra at that time. Continue with B6, seizure precautions, followup exam in 4 to 5 months time. (Tr. 1145.)

      J.W. was seen for a follow-up examination at the Arkansas Children's Hospital Rehabilitation Clinic by Dr. Vikki Stefans on August 31, 2011. (Tr. 1156.) Notation indicates that parents are looking at getting her back into a daycare. "She is not currently getting therapy; did not get any after discharge at all." She might be a little more agitated at night. They have not had to use the Diazepam. Assessment:" Young lady status post traumatic brain injury overall doing very well." (Tr. 1156-57.) Dr. Stefans recommended periodic therapy reevaluations. She also "raised the question on whether she might possibly wean from Keppra and for that purpose would like to see another EEG. She will be seeing Dr. O'Brien with a repeat imaging in October. I think it would be perfectly all right to try regular day care and had no additional recommendations at this time." (Tr. 1157.)

      Dr. Cheshier saw J.W. on October 13, 2011. He stated: "She is doing remarkably well. Growth is going nicely. Developmentally, she is making excellent progress. She has been dismissed from Kistler because she is doing so well. There are no real problems to be discussed today. The exam today is normal except for a little residual right-sided weakness." (Tr. 1189.)

      J.W. was seen at Sparks Regional Medical Center in September and October 2011 for cold symptoms such as cough, runny nose, fever, and sore throat. (Tr. 1195-1203.)

J.W. was seen at the Arkansas Children's Hospital Neurosurgery Clinic on November 6, 2011 by Dr. O'Brien. (Tr. 1170.) Dr. O'Brien reported: "She has done quite well since [her operation]. Mom and dad describe no symptoms referable to any increased intracranial pressure or neurological problems." (Tr. 1170.) On examination, she is a very alert, cheerful and cooperative little girl in no distress. Extrocular movements full. Pupils equal and reactive. The scalp wound is well healed. Motor system is intact in all 4 extremities." (Tr. 1170.) "CT scan shows essentially complete resolution of the subdural hematoma with only evidence on some calcium in the membrane. Some degree of encephalomacia left frontal and parietal lobe at the site of the previous in the occipital lobes. His impression was "Very good improvement following surgical excision of acute subdural hematoma." He stated "It will not be necessary for us to see [J.W.] in scheduled follow-up. . . . She can have her phenobarbital weaned off over a period of several weeks. " (Tr. 1170.)

Dr. O'Brien's exam is the last medical examination from Arkansas Children's Hospital in the record.

J.W.'s hearing with the ALJ took place on February 15, 2012. At that hearing, J.W.'s father testified that they had needed to cancel an appointment at Children's Hospital in January because J.W. was "under the weather." (Tr. 42.) When the ALJ queried him about Dr. O'Brien's comment they did not need to see J.W. again, her father replied that was just one doctor and that "different other doctors is still actually checking her out to make sure everything is okay." (Tr. 42.) He stated that her next appointment was April 2nd, and that they would need to keep seeing them for followup as long as she was on the Keppra. (Tr. 43.) He testified that he could provide the schedule from Children's for her upcoming appointments. (Tr. 42-43.) The ALJ noted that the last time she had been at Children's Hospital was in November, and requested that documentation of upcoming appointments. (Tr. 51.)

Neither documentation of upcoming appointments at Children's Hospital nor any other evidence of further examinations at Children's Hospital are in the record.

7

At the hearing, J.W.'s father testified that when he is watching J.W. in the evening while his wife is at work, she is still agitated and touching her head on the right hand side where he felt she was still having headaches. He stated that she favored her left side. He did not know if the Keppra was causing the agitation and other issues or not. (Tr. 42.) He testified that she has not had seizures that he knew about. (Tr. 44.) He testified that she is now at Bumblebee Daycare and doing very well, "probably one of the smartest persons in the class." "She's doing fine. She's really learning. She's actually learning and progressing... Her memory ...is good." He noted that, in contrast to the daycare where she got hurt, "[i]f you go to Bumblebee you will see a totally different atmosphere that our child actually interacts with other children and plays with other children." (Tr. 46.) He thought that her eating and potty-training habits had regressed since the accident. (Tr. 48.) He testified that she is angry and irritable and takes tantrums where she hits her head, so that they have put pads around their bed, where she sleeps with them at night. (Tr. 49.)

J.W.'s mother, Dee Ladawn West, testified that she is still seeing someone in neurology at Children's. (Tr. 54.) She testified that the April 2nd scheduled visit was with the neurosurgeon. (Tr. 55.) She testified that J.W. was not undergoing any physical or occupational therapy. (Tr. 56-57.) She did attend several sessions at Kistler, the Kistler said "she didn't need it." (Tr. 57.) She testified that she does some exercises with J.W.'s left arm to encourage her to use it more. (Tr. 57.) She said that since the accident, J.W. get very agitated at bed time, kicking and screaming. She stated that the kicking is just the left side. (Tr. 58.) She also sometimes hits her head at night. (Tr. 59.) She testified that J.W. has not had multiple absences from Bumblebee daycare. (Tr. 60.)

The ALJ's decision was dated June 14, 2012. On June 26, 2012, a teacher questionnaire filled out by Shonnie Ferguson, the owner of Bumblebee Daycare, was submitted into the record. (Tr. 6.) The owner indicated an unusual degree if absenteeism due to sickness. (Tr. 7.) She stated that "the child needs help in all areas for "acquiring and using information." (Tr 8.) Does good repeating class. assignments. [J.W.] is a

very outgoing and loving child." She indicated primarily serious problems with "attending and completing tasks." (Tr. 9.) She indicated "an obvious problem" for most behaviors of " in interacting and relating with others. (Tr. 10.) She noted "an obvious problem" for most activities in "moving about and manipulating objects." (Tr. 11.) Finally, she noted very few issues with "caring for self." (Tr. 12.)

There are two Childhood Disability Evaluation Forms in the record, completed by nonexamining Agency physicians. The first is from Dr. Stephen Whaley on July 22, 2011. (Tr. 504.) The second is from Dr. Jerrye Woods on September 9, 2011. (Tr. 1180.) Both agree on diagnosis and domain assessments. Both assess "less than marked" limitations for the domain of Health and Physical Well-Being, and "No Limitations" for all other domains. (Tr. 506, 1182.) The limitation for Health and Physical Well-Being appears to be due to the fact that J.W. remains on anti-seizure medication.

Plaintiff argues that the ALJ should have found that J.W. suffered at least marked impairment in the domains of "attending and completing tasks" and "interacting and relating to others." To support this argument, Plaintiff cited J.W.'s father's testimony that she still had multiple ongoing examinations with the Arkansas Children's physicians. She also cites the daycare owner's questionnaire. However, Plaintiff provided neither documentation of upcoming appointments at Children's Hospital nor any other evidence of further examinations at Children's Hospital. Nor are there any other medical records from Arkansas Children's Hospital provided past the November 2011 examination with Dr. O'Brien.

The daycare owner's response to the teacher's questionnaire was not submitted until June 26, 2012, after the ALJ had issued his opinion on June 14, 2012. Thus, it is conceivable that this evidence could have been new and material, and it was reviewed with this in mind. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994)( Reviewing courts have the authority "to order the Secretary to consider additional evidence, but 'only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence in the record in a prior proceeding.'"); *Woolf v. Shalala*, 3 F.3d 1210, 1215 (8th Cir. 1993) ("To be material, new evidence must be non-cumulative,

9

relevant, and probative of the claimant's condition for the time period for which benefits were denied, and there must be a reasonable likelihood that it would have changed the Secretary's determination.") However, the daycare owner's responses on the Teacher's Questionnaire are directly contradicted by the parent's own reports to various physicians, and their testimony regarding J.W.'s progress at that same daycare. Thus, it does not appear that it would have changed the ALJ's determination. Therefore it was not material. Nor is any explanation provided for why it was not submitted until more than four months after the hearing. Therefore there was no good cause shown for the failure to incorporate the evidence into the record in the prior proceeding. *See e.g. Hinchey*, 29 F.3d at 432 (no good cause shown when ALJ held open the record for approximately six months after the hearing to receive promised evidence before ruling, and the evidence in question was not submitted until after the decision was rendered).

Because the two pieces of evidence that the Plaintiff cites to support her argument are either nonexistent or inconsistent with the rest of the record, as well as filed late without good cause, the ALJ did not err in his domain assessment.

Plaintiff also argues that the ALJ failed to fully develop the record when he did not seek further clarification from the Plaintiff's teachers and doctors regarding the cope and extent of the limitations in this case. (Pl.'s Br. 14.)

"Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004). However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). The ALJ does not "have to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." *Id.* (emphasis added) (citing *Snead*, 360 F.3d at 839).

Upon review of this 1,251 page record, there is no indication that the ALJ failed to develop it. The ALJ found that all the evidence in the record supported the scenario of a child who had suffered a severe

10

head injury but had fortunately experienced a full recovery, with any side effects controlled by medication. After a thorough review of the record, this Court agrees.

The only evidence in the record which could support a need for further inquiry are the parental testimony of tantrums/irritability, some perceived regression in feeding herself and in potty-training, inconsistently reported residual weakness in one arm, and the report of the daycare owner. The report of the daycare owner was discussed and dismissed above. The ALJ considered the alleged potty training and feeding issues in several places in the opinion.

Regarding the complaints of residual weakness and tantrums/irritability, a notation for weakness did appear in Dr. Cheshiers's records, stating " a little mild right-sided weakness," and "a little residual right-sided weakness." (Tr. 1189.) However, parental testimony at the hearing referenced the left arm. (Tr. 42, 44.) The mother testified that physical therapists at Kistler told her the J.W. did not need any physical therapy. (Tr. 57.) The parents also did not report weakness issues for either side in any of the follow-up examinations with physicians at Arkansas Children's Hospital. The irritability was noted while J.W. was in the hospital, and countered with Vitamin B6. (Tr. 233.)The parents did not report the tantrums/irritability to the physicians during any of the follow-up examinations.

Thus, substantial evidence supports the scenario depicted by the ALJ and his decision in this case. Furthermore, the ALJ appears to have given Plaintiff every opportunity to provide additional documentation and raise any possible crucial issues, which she failed to do. There was no error.

### III. Conclusion

Based on the foregoing, we recommend affirming the decision of the ALJ and dismissing Plaintiff's case with prejudice.

**The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in**

**waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 2nd day of May 2014.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE